Filed 9/14/20  P. v. Robinson CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>          v.<br><br>JOSHUA JEREMY ROBINSON,<br><br>     Defendant and Appellant. | F077859<br><br>(Super. Ct. Nos. BF169278A,<br>BF164480B)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  J. Eric Bradshaw, Judge.

Jacquelyn Larson, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Amanda D. Cary, and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Joshua Jeremy Robinson was convicted by a jury of possession of methamphetamine for sale and being a convicted felon in possession of ammunition.  He raises four issues on appeal:  (1) the trial court erred in admitting evidence of statements he made to his probation officer in response to questions asked without his first having

received *Miranda*[1] warnings; (2) the trial court abused its discretion in admitting evidence of a prior arrest to impeach his testimony; (3) the trial court abused its discretion in allowing the jury to hear about his probation status; and (4) if the first three claims of error are each insufficient to warrant reversal, the cumulative effect of the errors requires reversal. We affirm.

## STATEMENT OF THE CASE

The Kern County District Attorney filed an information charging Robinson with possession of methamphetamine for sale (Health & Saf. Code, § 11378; count 1), possession of ammunition by a felon (Pen. Code, § 30305, subd. (a); count 2), and misdemeanor possession of methamphetamine (Health & Saf. Code, § 11377, subd. (a); count 3.)

Robinson was convicted on counts 1 and 2. He was sentenced to a total term of three years eight months in prison as follows: the upper term of three years on count 1, plus eight months (one-third the midterm of two years) on count 2. Count 3 was dismissed by the court on the prosecutor's motion.

## STATEMENT OF FACTS

### I.      The prosecution's case

On July 21, 2017, Robinson was on probation for a prior conviction.[2] At 10 a.m. that day, probation officers arrived at an auto body shop located at 644 Belle Terrace in Bakersfield. The lead probation officer on the scene, Martha Robles, testified the officers arrived at the shop for the purpose of locating and arresting Robinson for a probation violation. Robles was Robinson's probation officer, and she had learned Robinson had been arrested a few days prior and had "reported" the shop's address. She testified that it is typical for probation officers to go to the homes of people they are supervising and that

---

[1] *Miranda v. Arizona* (1966) 384 U.S. 436.

[2] All further references to dates are to dates in 2017 unless otherwise noted.

2.

she attempts to do monthly home calls. Prior to arriving at the shop on July 21, Robles believed the shop was an additional residence for Robinson.

Robles and another probation officer knocked on the door of the shop. Robinson opened the door and said he had been asleep. His eyes were squinted, his hair was "a little messy," and he appeared to Robles to have been asleep. Robles introduced herself to Robinson as his probation officer and informed him she needed to make contact with him. Robinson granted the officer entry into the shop, and the officers followed Robinson into the shop's office.

The shop was a large open space. There were three cars in the shop along with a lot of tools, materials, and cabinets. There was a staircase that led to a bedroom directly above the shop. There were no locks on the office or bedroom doors. There was also a restroom in the shop, but no shower or tub. Robinson told Robles he had spent the night at the shop the night before and that he slept in the bedroom in the shop "on occasion." He also said he had owned the shop for about three years.

Robles decided to conduct a search of the shop. She did not personally participate in the search, but instead had several other deputy probation officers perform the search. The officers searched the shop, including the upstairs bedroom. The officers located over 400 rounds of live ammunition inside an unlocked cabinet in the shop. The officers also searched inside of a freezer located under the stairs leading up to the bedroom. Inside they found a sunglasses case containing a clear plastic baggie containing a white crystalline-like substance that later tested positive as 6.33 grams of methamphetamine. The freezer had no lock on it. Inside an unlocked cabinet in the upstairs bedroom, the officers found a black plastic baggie containing a substance that later tested positive for 17.3986 grams of methamphetamine.

A deputy probation officer testified as a drug expert and stated a useable amount of methamphetamine would typically be about one-tenth of a gram. However, that amount may vary depending on an individual's "tolerance, how much they use, and how

often they have been using." He testified most methamphetamine users would purchase one to two grams at a time. He further stated he believed the approximately 23 grams of methamphetamine found in the two baggies were possessed for the purpose of selling, even though other indicia of drug sales such as scales, cash, or packing supplies were not located at the shop. The officer explained the two baggies together contained enough methamphetamine for over 230 uses based on a one-tenth of a gram usage rate, and had a combined street value of between $200 and $500.

### Officer Randy Petris's testimony

Officer Randy Petris was a police officer with the Bakersfield Police Department. He testified he was on duty on July 18 and responded to 644 Belle Terrace that day. He made contact with Robinson, who said he was the owner of the business and was currently living at the business and that it was his residence. Petris did not ask Robinson how long he had been living there.

Petris went inside of the shop and noticed things indicating someone may be living there. He noticed the upstairs bedroom contained a bed with sheets and a cover, clothing, and personal items. The bathroom downstairs had a toilet and sink, as well as items such as a razor and shaving cream. There was also a woman there who said she had stayed overnight with Robinson in the bed upstairs. Petris also noted there was no shower or tub anywhere in the business.

## II.  Robinson's testimony

Robinson testified in his own defense. Prior to taking the stand, the judge read to the jury a stipulation by the parties that Robinson had "been previously convicted of a felony." Robinson began his testimony by acknowledging he was on felony probation for the unlawful sale of a controlled substance and hence not allowed to own ammunition. He then offered his explanation of why he was innocent of this prior conviction. He explained he was giving a friend a ride one day. He drove the friend to a certain location where the friend exited the car. After the friend returned, Robinson drove off and was

4.

stopped within a couple of miles by sheriff's deputies. Robinson consented to a search of the car, and deputies found a backpack containing methamphetamine and scales. Robinson said the backpack belonged to the friend, although Robinson was convicted of possession of methamphetamine for sales.

Regarding the present charges, he testified that he did not know about the methamphetamine and ammunition found at the shop on July 21 and that those illegal items did not belong to him. He stated he lived on Sunset Canyon Drive in Bakersfield, but would occasionally sleep in a bedroom above the office in his shop on Belle Terrace. He employed approximately four to five people, and these employees, as well as his family, had access to the bedroom. Some of his employees, as well as friends he trusted, had slept in the bedroom on occasion.

After Robinson stated he did not know there was suspected methamphetamine in the bedroom area, his counsel asked him why he did not know that. He responded, "I just didn't. I had no knowledge of it. I mean, it's not something I typically suspect of people that are coming in and out of my shop, or employees. I mean, even the employees, we drug test them, and I wouldn't think anybody would want to risk their employment or the job over it."

Robinson also denied knowing there was methamphetamine in the freezer. When asked how he did not know that, he said, "That freezer, it's only used as-needed. I use it to freeze nitrous bottles in order to fill them, and just happenstance that around that time there was a—something going on where there was a nitrous shortage. I really didn't use it much, other than I think the only thing it got used for was if the guys put their ice cream or anything they needed frozen in there. I typically didn't use it that often around that time."

When his counsel asked how he did not know about the ammunition found in the shop, Robinson explained, "I don't have a gun. I wouldn't store it down there even if I had one. I'm a restricted person, so I can't have one. And the cabinet that they found it

5.

in is one that's very seldomly used. We keep, like, light bulbs and other electrical fixtures that—I think last time I had even been in that cabinet would be a month or at least two months prior to the time that it had been searched."

Robinson admitted he had used methamphetamine, but denied having ever sold it.

On cross-examination, Robinson explained he slept at the shop the night before at his desk. He recalled speaking with Officer Petris on July 18, but did not recall telling him the shop was his residence. The prosecutor asked, "So Officer Petris was lying when he said that you told him that you resided at your business?" Robinson answered, "I— I—I'm not saying that he's lying. I'm just saying that I never used that address as a residence address." The prosecutor followed up, "Did you provide the business address to police officers the day that you spoke with Officer Petris?" Robinson said, "No," and the prosecutor asked, "Okay. So you don't know how they got that address and stated that that was your residence?" Robinson answered, "No, I don't."

Robinson said he kept a toothbrush at the shop, and stated he did not use shaving cream. He also said the bed and sheets in the shop were not his, and that any clothing left in the shop bedroom was not his besides the uniforms and pair of shoes that were in there. However, he did admit that he had previously slept in the bed. He also stated he had last used methamphetamine approximately four weeks prior to July 18.

Robinson stated he had never fired a gun before except for a BB gun, and had only handled ammunition only once or twice in his life. The last time he had opened the cabinet where the ammunition was found was approximately six weeks prior.

The prosecutor asked Robinson, "Have you ever been aware of methamphetamine being found at [the shop]?" Robinson said no. The prosecutor then asked, "So to your recollection today, methamphetamine has never been found at that Belle Terrace location?" The court interjected and requested a sidebar. After the sidebar, the prosecutor asked Robinson, "And going specifically to the three years that you have been

an owner of that business, have you ever been aware of ammunition being found at that business?" Robinson again said no.

On redirect examination, Robinson's counsel asked him about the events that occurred on July 18. He stated law enforcement came to his shop because they were investigating a report of shots being fired. Officer Petris made contact with him and asked him if he was on probation, and Robinson confirmed he was. Robinson consented to a search of the shop. He did not recall whether anyone else was present with him at the shop at that time. After the search was conducted, Robinson was placed under arrest but not initially told why. It was not until he arrived downtown that they told him he was being charged with possession of methamphetamine and ammunition.

He further testified on redirect he did not recall having any methamphetamine or ammunition "on [him]" that day, and had "no idea" how methamphetamine was found in his business on July 18 and July 21. He said he searched the shop after his arrest on July 18. He explained he tries to "take the best inventories [he] can and know what's in [his] business." He also said he told his employees that "anything like that" was not going to be tolerated at the shop. Regarding the ammunition, he explained he thought he had given all of it to a friend of his, but that he did not think his friend took all of it. He said, "There might have been a couple left that I think he was there picking up, actually, the day of the arrest[.]" Robinson concluded his testimony by stating he does not bring methamphetamine into his business and would not expect there to be ammunition in his business either.

## DISCUSSION

### I.  No *Miranda* violation

Robinson first contends the trial court erred in admitting into evidence his statements made in response to Officer Robles's questions on July 21 regarding his residence at the shop. He contends Robles's questions regarding whether and how often he slept at the shop "were designed to elicit an incriminating response, thereby requiring

7.

*Miranda* warnings." We conclude that while Robinson was in custody at the time Robles asked these questions, the questions did not qualify as "interrogation" under the *Miranda* doctrine as they were "routine booking questions," and thus no *Miranda* violation occurred.

We review the trial court's determination that a defendant was not subjected to custodial interrogation as a mixed question of law and fact. (*People v. Kopatz* (2015) 61 Cal.4th 62, 80 (*Kopatz*).) " 'When reviewing a trial court's determination that a defendant did not undergo custodial interrogation,' an appellate court accepts the trial court's findings of historical fact if supported by substantial evidence but independently determines 'whether, given those circumstances,' the interrogation was custodial." (*Ibid*.)

A suspect's statement obtained as the result of a "custodial interrogation" is not admissible absent a knowing and intelligent waiver of the right to remain silent, the right to the presence of an attorney and, in the case of an indigent suspect, the right to appointed counsel. (*People v. Elizalde* (2015) 61 Cal.4th 523, 534 (*Elizalde*).) "*Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." (*Rhode Island v. Innis* (1980) 446 U.S. 291, 300–301 (*Innis*).) An interrogation is custodial when "a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." (*Miranda, supra,* 384 U.S. at p. 444.) An interrogation is not "limited to express questioning. Instead, the term refers to 'any words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect.' " (*Elizalde, supra,* 61 Cal.4th at p. 531.) We will discuss in turn how Robinson was in custody but nevertheless not subject to "interrogation."

### A. Additional facts

Prior to trial, Robinson moved to preclude the statements he made to Robles before receiving *Miranda* warnings. The trial court conducted a hearing pursuant to

Evidence Code section 402[3] to determine the admissibility of the statements, and Robles was the sole witness called at the hearing.

Robles testified she arrived at Robinson's shop at 644 Belle Terrace at 10 a.m. on July 21. Robinson opened the door and Robles introduced herself as his probation officer and asked him if she and other probation officers could come in.[4] Robinson granted entry, and the officers followed him to the shop's office. The officers were in uniform and were armed. Robles restated she was his probation officer and told Robinson he needed to follow Officer Julio Martinez's instructions. Officer Martinez proceeded to pat Robinson down, place him in handcuffs, and arrest him for a violation of probation. Robinson was not given *Miranda* warnings at that time.

Robles proceeded to "ask [Robinson] his current residence." He had previously reported to probation an address on Sunset Canyon Drive, but "on recent days prior" he reported the Belle Terrace address. Thus, Robles was asking Robinson "his actual address of where he lived." Robinson informed Robles the Sunset Canyon Drive address was his residence, but he had owned the business on Belle Terrace for almost three years and "on occasion" slept there and had a room above the office to sleep. Robinson said he had spent the prior night at the business.

Robles affirmed the questions regarding Robinson's residence were "in relation to the probation violation specifically," though she did not specify how Robinson had violated probation. She later stated she "was confirming where he lived for probation purposes[.]" She explained the probation department has to be aware of where a probationer lives because probationers are subject to search per their probation terms and

---

[3] Undesignated statutory references are to the Evidence Code.

[4] Robles testified on cross-examination she was initially accompanied by one other officer, then two additional officers entered after.

conditions, and knowing a probationer's address allows for probation officers to make contact with the probationer.

Robles had no indication she might find anything upon a search of the business, and no indication that questioning Robinson about his residence would in some way implicate him "in any further crime." However, the officers subsequently conducted a search of the shop that uncovered certain items that resulted in "a new law violation." Robles then gave Robinson *Miranda* warnings, and Robinson said he wished to speak with an attorney.

### B.    Custody

Only the objective circumstances of the interrogation are relevant to determine if an individual is in custody, not " ' "subjective views harbored by either the interrogating officers or the person being questioned." ' " (*Kopatz, supra,* 61 Cal.4th at p. 80; *Yarborough v. Alvarado* (2004) 541 U.S. 652, 663.) The test is whether a " 'reasonable person in the suspect's position [would] experience a restraint on his or her freedom of movement to the degree normally associated with a formal arrest.' " (*People v. Bejasa* (2012) 205 Cal.App.4th 26, 35.) In determining whether a defendant was in custody for purposes of *Miranda*, the circumstances surrounding an incident must be considered as a whole. *Miranda* protections attach only if an individual is both in custody and being interrogated. (*Miranda, supra,* 384 U.S. at p. 444; *People v. Mickey* (1991) 54 Cal.3d 612, 648.)

The totality of the circumstances considered includes " '(1) whether the suspect has been formally arrested; (2) absent formal arrest, the length of the detention; (3) the location; (4) the ratio of officers to suspects; and (5) the demeanor of the officer, including the nature of the questioning. [Citation.] Additional factors are whether the officer informed the person he or she was considered a witness or suspect, whether there were restrictions on the suspect's freedom of movement, whether the police were aggressive, confrontational, and/or accusatory, and whether the police used interrogation

techniques to pressure the suspect." (*People v. Davidson* (2013) 221 Cal.App.4th 966, 972.)

Here, the People concede Robinson was in custody when Robles questioned him about his residing at the shop. We agree with the parties Robinson was in custody because he had been placed in handcuffs and told he was under arrest.

### C.    Interrogation

Both parties cite to *Innis, supra,* 446 U.S. 291 in discussing the definition of "interrogation" for *Miranda* purposes. There, the United States Supreme Court explained: "We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." (*Id.* at p. 300–302, fns. omitted.)

The People assert this definition from *Innis* provides the applicable framework for this case. However, it appears from Robinson's briefing that he believes we should employ a slightly different framework articulated by the Court of Appeal in *Brown v. Superior Court* (2002) 101 Cal.App.4th 313 (*Brown*). There, Brown was on probation

11.

for a stalking conviction and was required to undergo counseling. (*Id.* at p. 317.) During his probationary period, Brown's probation officer, upon the recommendation of Brown's psychologist, asked the court to impose as an additional probation term that Brown be required to submit to periodic polygraph examinations. (*Id.* at p. 318.) The trial court agreed and approved the imposition of periodic polygraph examinations as an additional term of probation. (*Id.* at p. 319.) Brown filed a writ of mandate challenging the term on several grounds, including on the ground that mandating polygraph examinations is per se a violation of Brown's Fifth Amendment right to not incriminate himself. (*Id.* at pp. 317, 319.)

The Court of Appeal disagreed that a probation term requiring a defendant to answer questions via polygraph examinations was per se unconstitutional. (*Brown, supra,* 101 Cal.App.4th at p. 319.) The court explained that Brown's duty to answer a polygraph examiner's questions truthfully does not mean his answers are compelled within the meaning of the Fifth Amendment, because the privilege against self-incrimination is not self-executing, but instead must be claimed. (*Id.* at p. 320.) The court continued: "Thus, unless Brown specially invokes the privilege, shows he faces a realistic threat of self-incrimination and nevertheless is made to answer the question or questions, no violation of his privilege against self-incrimination is suffered. [Citations.] Of course, if the State puts questions to a probationer that call for answers that would incriminate him in a pending or later criminal proceeding, and expressly or by implication asserts that invocation of the privilege would lead to revocation of probation, the answers would be deemed compelled under the Fifth Amendment and thus involuntary and inadmissible in a criminal prosecution. [Citations.] On the other hand, if the questions put to the probationer are relevant to his probationary status and pose no realistic threat of incrimination in a separate criminal proceeding, the Fifth Amendment privilege would not be available and the probationer would be required to answer those questions truthfully." (*Ibid.*)

Robinson's analysis operates under the above-quoted rule from *Brown*. However, *Brown* presented a categorically different factual scenario. There, the defendant was subject to being forced to answer questions as a condition of his probation. Presented with that specific factual scenario, the Court of Appeal took up the task of explaining under what circumstances the Fifth Amendment would be implicated when a probationer is compelled to answer questions. It is clear the rule statement from *Brown* would apply only in the narrow factual scenario of when a probationer is *compelled* to answer questions that would incriminate him in a separate criminal proceeding. Specifically, the type of compelled questioning that would implicate the Fifth Amendment in this scenario is that where the government "expressly or by implication asserts that [the defendant's] invocation of the privilege [against self-incrimination] would lead to revocation of probation." (*Brown, supra,* 101 Cal.App.4th at p. 320.)

Here, since there are no facts in the record indicating Robles, or any other government actor, asserted either expressly or impliedly to Robinson he would have his probation revoked had he asserted his right to remain silent, the *Brown* framework is not appropriate for our analysis of the facts in Robinson's case.

We thus, as a starting point to our analysis, employ the definition of "interrogation" set forth by the Supreme Court in *Innis*. Again, the Supreme Court in that case held that " 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (*Innis, supra,* 446 U.S. at p. 301, fns. omitted.) The Court further explained the relevant question is whether the law enforcement officer who questioned the defendant "*should have known* [his or her questions] were reasonably likely to elicit an incriminating response." (*Id.* at p. 302, fn. omitted.) With the general rule established, we now consider the "routine booking questions" exception, which will ultimately control our analysis.

### 1. Routine booking questions

The Supreme Court has made clear that police interrogations "normally attendant to arrest and custody" are not interrogations. (*Innis, supra,* 446 U.S. at p. 301.) An interrogation does not occur when police pose questions limited to basic " ' "biographical data necessary to complete booking or pretrial services." ' " (*Elizalde, supra*, 61 Cal.4th at p. 535; *People v. Williams* (2013) 56 Cal.4th 165, 187.) California permits the type of booking questions allowed in *Pennsylvania v. Muniz* (1990) 496 U.S. 582, which are essentially neutral, such as questions about an arrestee's name, address, date of birth, place of birth, phone number, and occupation. (See *Elizalde*, at pp. 535–536 ["[w]hen booking questions go beyond the basic biographical data contemplated in *Muniz*, the core concerns of *Miranda* and *Innis* are implicated"].) When these types of questions about basic biographical data are posed, there is no need to assess whether they will elicit an incriminating response. (*Elizalde*, at p. 535.) However, questions that go beyond the request for basic biographical data must be measured under the general test for interrogation—that is, should the police have known that the question was reasonably likely to elicit an incriminating response. (*Id.* at p. 538.)

Here, the record demonstrates Robles's unadmonished questions to Robinson were strictly limited to determining his current residence or address. Robles did not ask him any questions regarding whether he was guilty of any of the charges for which he was arrested on July 18, whether there were any illicit items present in the shop on July 21, or whether he owned any specific items—whether legal or illicit—in the shop. Robles's questions were hence about "basic biographical data," and therefore we need not assess their likelihood to elicit an incriminating response. (*Elizalde, supra,* 61 Cal.4th at p. 535.)

### C. Any Error Harmless

Even were we to assume the trial court erred in admitting Robinson's statements to Robles, we find the error harmless. Robinson asserts he would not have testified had

14.

the trial court excluded the evidence of his un-*Mirandized* statements. He in turn contends it is "impossible to know" what the jury's verdict would have been absent Robinson's challenged statements and trial testimony. We do not agree.

Federal constitutional errors are reviewed under the standard set forth in *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). (*Arizona v. Fulminante* (1991) 499 U.S. 279, 309–312; *Elizalde, supra,* 61 Cal.4th at p. 542; *People v. Cahill* (1993) 5 Cal.4th 478, 510.) Under *Chapman*, we "must determine whether it is clear beyond a reasonable doubt that a rational jury would have rendered the same verdict absent the error." (*People v. Merritt* (2017) 2 Cal.5th 819, 831; accord, *Neder v. United States* (1999) 527 U.S. 1, 15–16; *People v. Gonzalez* (2012) 54 Cal.4th 643, 663). " 'To say that an error did not contribute to the ensuing verdict is … to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.' [Citation.] Thus, the focus is what the jury actually decided and whether the error might have tainted its decision." (*People v. Neal* (2003) 31 Cal.4th 63, 86; accord, *People v. Leon* (2016) 243 Cal.App.4th 1003, 1020.) We consider "not only the evidence that would support the judgment, but also the impact of the inadmissible evidence on the final outcome." (*People v. Gonzalez* (2012) 210 Cal.App.4th 875, 884.)

Under the *Chapman* standard, we find any alleged error to be harmless. Even without Robinson's answers to Robles regarding his residing at the shop or his trial testimony, the evidence tying him to the methamphetamine and ammunition found at the shop was strong. When Robles arrived at the shop on July 21, Robinson was there by himself and appeared to have been asleep. Additionally, Petris testified Robinson had told him just three days prior that he owned the business and was currently using it at his residence. Petris also spoke with an unnamed woman at the shop who stated she had spent the previous night there with Robinson. In sum, Robinson's statements to Robles regarding his residing at the shop were far from the only evidence connecting him to the

shop and the illicit items found therein. Thus, we are satisfied beyond a reasonable doubt that a rational jury would have entered the same verdict absent the claimed error.

## II.    Evidence of prior arrest

Robinson claims the trial court prejudicially erred by admitting evidence of his July 18 arrest for possession of methamphetamine for sales and ammunition. We conclude there was no abuse of discretion.

### A.    Additional facts

The prosecution filed a motion in limine under section 1101, subd. (b), seeking to admit evidence Robinson had been arrested three days before the incident at issue for "drug sales and ammunition possession[.]" The prosecution sought to call Officer Petris to testify to the facts that officers conducted a probation search of the Belle Terrace property on July 18, that Robinson stated he lived at the business and that it was his residence, and that methamphetamine was found in "[Robinson's] bedroom" totaling 11 grams in package weight. These facts, according to the prosecution, would show intent, motive, identity, and lack of mistake.

At the pretrial conference, the prosecution offered a compromise on its motion in limine. It proposed that there would be no mention of the officer's finding methamphetamine on July 18 and subsequently arresting Robinson, only mention of Robinson's statements to officer regarding his residing at the shop. The trial court denied the motion in limine in part and granted it in part. It ruled there would be, at least initially, no mention of an arrest being made or methamphetamine being found on July 18. The court cited section 352 as the basis for its ruling. However, the court also indicated that the discovery of methamphetamine on July 18 could become "very relevant" depending on the evidence presented at trial.

Robinson's testimony on direct examination focused in part on his asserted lack of knowledge of the methamphetamine and ammunition in his shop. He also denied the illegal items were his. His attorney asked him how he did not know about the

methamphetamine and the ammunition found in the shop. With respect to the methamphetamine found in his shop, not only did he contend it was not his, but he stated, among other things, methamphetamine was not something he suspected people of bringing into his shop.

On cross-examination, the prosecution asked Robinson if he was aware of methamphetamine or ammunition ever being found at the shop, and Robinson answered no. On redirect examination , Robinson's counsel asked him questions about the details of the arrest on July 18, including the discovery of methamphetamine and ammunition at the shop. During redirect, Robinson admitted that he was made aware by one of the officers that methamphetamine and ammunition had been found at the shop, hence the reason for his arrest.

Following Robinson's testimony, his trial counsel moved for a mistrial "because of the testimony that was asked of Mr. Robinson with regards to the prior arrest and incident." Counsel explained:

> "There was a sidebar conversation where [the district attorney] requested or stated that since the door had been opened to the previous incident, I—I disagreed that any door had been opened, but it was my understanding that the Court did allow [the district attorney] then to ask if [Robinson] had ever known of methamphetamine at his place of business.

> "… I did communicate that it was my concern that Mr. Robinson would not necessarily answer the question in which he perhaps intended to because he knows that great efforts have been made to separate the first arrest on July 18th from this second arrest on July 21st; that it wasn't his attempt to be dishonest in anyway, but again believing that that previous case was not to be mentioned.

> "The jury has now heard about it. I attempted to address that upon the cross-examination of Mr. Robinson, but based upon that line of questioning, I do believe a mistrial is appropriate."

The prosecution responded:

> "So the trigger point, as identified by [defense counsel], was my question as to whether or not methamphetamine had ever been found at that

17.

business. That question followed [defense counsel's] direct in which it was laid out that he did not go into or search the areas where methamphetamine was found in this instance; he supposedly had no prior knowledge of methamphetamine being there or at that particular business; thereby, a seemingly relevant question as to if he had ever been aware if meth had ever been found there.

"In addition to what I've just stated, this question is directly under 1101(b) and impeachment 1101(b) for a variety of reasons, but primarily demonstrating the absence of mistake of someone simply finding methamphetamine there, having no prior clue that it may be at that business, and impeachment because [Robinson] directly stated he was not aware of that having happened, even though he was arrested for that exact same set of contacts which we already addressed."

The court denied Robinson's motion for a mistrial.

## B. Analysis

Specifically, Robinson contends the trial court erred by allowing the prosecution to ask Robinson questions regarding whether he had ever been aware of methamphetamine or ammunition being found at his business. He argues that Robinson could not answer these questions without implicating the facts of the July 18 arrest, and in turn asserts he would not have had to delve into the specific facts of that prior incident had the prosecution not first asked its questions.

In Robinson's view, the details of the July 18 arrest had little probative value to any of the issues in this case, and were "extremely prejudicial" as they invited the jury to engage in "propensity reasoning." Additionally, he contends the presentation of the arrest led to an undue consumption of time, confusion of the issues, and misleading of the jury. We disagree.

Section 1101 limits the admission of prior misconduct to prove conduct on a particular occasion, but it does not "affect[ ] the admissibility of evidence offered to support or attack the credibility of a witness." (§ 1101, subds. (a), (c).) Generally speaking, evidence "that has any tendency in reason to prove or disprove the truthfulness of a [witness's] testimony" is admissible. (§ 780; see also § 210.) Although "[n]ot all

18.

past misconduct has a 'tendency in reason to prove or disprove' a witness's honesty and veracity" (*People v. Wheeler* (1992) 4 Cal.4th 284, 295), "[a] witness may be impeached with any prior conduct involving moral turpitude whether or not it resulted in a felony conviction, subject to the trial court's exercise of discretion under … section 352." (*People v. Clark* (2011) 52 Cal.4th 856, 931.) "Section 352, in turn, permits a trial court to 'exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' (§ 352.)" (*People v. Turner* (2017) 13 Cal.App.5th 397, 408 (*Turner*).)

"Prior misconduct can also be admissible to impeach a witness under section 780, subdivision (i)—which applies to evidence that tends to establish '[t]he existence or nonexistence of any fact testified to by [the witnesss]'—by suggesting a particular aspect of the witness's testimony is untrue. [Citations.] The admission of impeachment evidence on this ground remains subject to section 352." (*Turner, supra,* 13 Cal.App.5th at p. 408.)

" 'A trial court's ruling to admit or exclude evidence offered for impeachment is reviewed for abuse of discretion and will be upheld unless the trial court "exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Lucas* (2014) 60 Cal.4th 153, 240.) Applying this standard, we conclude there was no abuse of discretion.

Here, the trial court properly allowed the prosecution to inquire into whether Robinson was aware of methamphetamine or ammunition having ever been found at his business. This is because Robinson opened himself up to impeachment when he testified on direct examination that he had no knowledge of the methamphetamine found on July 21 because methamphetamine is "not something [he] typically suspect[s]" people of bringing into his shop.

Robinson's testimony involved far more than a mere assertion he was unaware of the methamphetamine found on July 21. Indeed, Robinson was clearly attempting to convey to the jury he had no reason to even suspect methamphetamine would be in his business. However, the fact that methamphetamine was found in his business just three days prior tended to show that this aspect of his testimony was untrue.

The prosecution's questions were thus relevant as they tended to disprove Robinson's truthfulness. This relevance was not substantially outweighed by the risk of any undue prejudice. Contrary to Robinson's characterization, his testimony regarding his awareness of methamphetamine and ammunition being found in the shop in the past was brief and did not result in an undue consumption of time. This testimony was also straightforward, easy to understand, and presented no risk of confusing the issues or misleading the jury. Additionally, Robinson's testimony on redirect examination regarding the details of the July 18 arrest was relatively brief and did not present a risk of confusing the issue or misleading the jury. The evidence regarding the two incidents was not complex, and the jury would not have had any trouble keeping the evidence of the two dates temporally separated in their minds.

## C.    No prejudice

In any event, the admission of testimony concerning Robinson's awareness of methamphetamine and ammunition having been found in the past, as well as the broader evidence of the details of the July 18 incident, was harmless.

"Evidentiary errors under state evidence rules are evaluated under the 'reasonable probability' standard of prejudice announced in *People v. Watson* (1956) 46 Cal.2d 818." (*People v. McDaniel* (2019) 38 Cal.App.5th 986, 1005 (*McDaniel*).) Under this standard, reversal is required only if, "considering the record as a whole, there is a reasonable chance that had the complained-of evidence been excluded, the result of the proceeding would have been more favorable to [Robinson]." (*Ibid.*)

20.

Here, there is no reasonable chance the verdict would have been different. Even had the jury not heard about the arrest or the discovery of illicit items on July 18, the jury heard evidence from Officer Petris that Robinson admitted the shop was his residence, and that an unnamed woman present at the shop that day confirmed she had spent the previous night there with Robinson. Additionally, Officer Robles testified that Robinson was alone at the shop on July 21 and looked like he had just woken up. This was strong evidence Robinson had control of the shop and the items within it. Thus, in spite of Robinson's claims the methamphetamine and ammunition found on July 21 were not his and he did not know of them, the jury had ample evidence to conclude the illicit items were his.

## III. Evidence of probationary status

Prior to trial, Robinson filed a motion in limine to exclude any testimony regarding the fact he was on probation at the time of his arrest on the charges in this case. The trial court ruled that the terms of his probation as well as the reason he was on probation should not be disclosed to the jury, but allowed the jury to hear that he was on probation. The court ruled Robinson's probationary status was germane to explaining the reason why probation officers were there on July 21. The court also noted evidence of Robinson's prior conviction was going to be presented to the jury, and in light of that, Robinson's probationary status was unlikely to be a "startling revelation to anybody."[5]

Robinson contends the trial court abused its discretion by allowing the jury to hear he was on probation. He contends the evidence of his probationary status was substantially more prejudicial than probative under section 352.

Section 350 provides: "No evidence is admissible except relevant evidence." " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a

---

[5] At the time the trial court made this ruling, it had already granted another in limine motion by the prosecution to admit evidence of Robinson's prior felony conviction for drug sales in violation of Health and Safety Code section 11379, subdivision (a).

21.

witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (§ 210.)

Section 351 provides: "Except as otherwise provided by statute, all relevant evidence is admissible." Section 352 permits a trial court to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§ 352.)

"In determining the admissibility of evidence, the trial court has broad discretion." (*People v. Williams* (1997) 16 Cal.4th 153, 196.) "On appeal, a trial court's decision to admit or not admit evidence … is reviewed only for abuse of discretion." (*Id.* at p. 197.) The trial court abuses its discretion "when its determination is arbitrary or capricious or ' "exceeds the bounds of reason, all of the circumstances being considered." ' " (*People v. Welch* (1993) 5 Cal.4th 228, 234.) Under this standard, no abuse of discretion occurred here.

Robinson contends the evidence of his probationary status had little probative value to the issue of his guilt or innocence of the underlying charges. However, as the trial court properly noted, the evidence of Robinson's probationary status was particularly relevant to explaining why the probation officers came to Robinson's shop on July 21. Not telling the jury about Robinson's probation status would surely have left the jury to wonder why probation officers came to the shop, arrested him, and proceeded to search the shop. (See *United States v. Vretta* (7th Cir. 1986) 790 F.2d 651, 655 ["Evidence is relevant if its exclusion would leave a chronological and conception void in the story"].) There was, of course, no evidence presented to the jury of a 911 call made, or any other reason why officers would be there.

Robinson also contends the evidence of his probationary status was "unfairly prejudicial" as it allowed the jury to "speculate as to his 'bad' character" and engage in "propensity reasoning." We disagree. Not only was evidence of Robinson's

probationary status relatively weak compared to the evidence of his prior conviction, but this alleged unfair prejudice certainly did not substantially outweigh the relevancy of the evidence.

Nevertheless, any error in allowing to the jury to learn of Robinson's probation status was harmless. "Evidentiary errors under state evidence rules are evaluated under the 'reasonable probability' standard of prejudice announced in *People v. Watson* (1956) 46 Cal.2d 818." (*McDaniel, supra,* 38 Cal.App.5th at p. 1005.) Again, under this standard, reversal is required only if, "considering the record as a whole, there is a reasonable chance that had the complained-of evidence been excluded, the result of the proceeding would have been more favorable to [Robinson]." (*Ibid.*)

Here, the balance of the evidence was strong. As discussed, two officers testified Robinson had been at least occasionally residing at the shop. From this, the jury could readily infer he would have ownership or control over the items found in the shop. The jury also heard evidence that methamphetamine and ammunition were found at the shop just three days prior to his arrest on the current charges, which cut against Robinson's assertion he had no reason to suspect any of those illegal items would be in his shop. Considering the totality of the evidence and circumstances, it is highly unlikely Robinson's probationary status factored into the jury's weighing of the evidence, and thus we conclude there is no reasonable chance the verdict would have been different had the jury not learned of Robinson's probationary status.[6]

---

[6] As we have rejected all of Robinson's specific claims of error, Robinson's claim of cumulative error necessarily fails.

23.

## DISPOSITION

The judgment is affirmed.

SNAUFFER, J.

WE CONCUR:

MEEHAN, Acting P.J.

DE SANTOS, J.

24.